BABCOCK & WILCOX CO. v. TOLEDO BOILER WORKS CO. (two cases).

(Circuit Court of Appeals, Sixth Circuit.   May 18, 1909.)

Nos. 1,902 and 1,903.

1. PATENTS (§ 129*)—SUIT FOR INFRINGEMENT—ESTOPPEL.

A corporation charged with infringement of a patent is not estopped to deny its validity merely because the patentee who sold and assigned it is a subordinate in its employment.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 182½–186; Dec. Dig. § 129.*]

PATENTS (§ 328*)—INVENTION—IMPROVEMENTS IN WATER-TUBE BOILERS.

The Park patents, No. 747,329, for a baffle wall brick used in the construction of baffle walls of water-tube boilers, and No. 744,015, for a handhole cover for closing the hand-holes in the headers of water-tube boilers, are both void for lack of patentable invention over the prior art.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

C. P. Byrnes, for appellant.

Wilbur A. Owen and R. H. Parkinson, for appellee.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

LURTON, Circuit Judge.   These two cases, involving alleged infringements of two different patents, were heard together. This was feasible because the parties were the same in each case, and, though two distinct patents are involved, they pertain to appliances in connection with water-tube boilers, and each is alleged to have been used in the same structure. The defense was anticipation, nonpatentability, and the assertion that the equitable title to the patent, if valid, is in the defendants.

1. The patent involved in case No. 1,902 is a patent dated December 15, 1903, issued to the Aultman & Taylor Machinery Company, assignee of the inventor, Kennedy Park. The patent is for an improved baffle wall brick, used in the construction of baffle walls of water-tube boilers. The inventor, in his patent, states:

"The object of the invention is to 'prevent the leakage of gases through the baffle wall, to reduce the number of joints, and to protect the brick by a metal casing during handling or transportation, while protecting the metal casing from the gases when in place."

The patent involved in case No. 1,903 is another invention of the same Kennedy Park, the patent issuing to the same Aultman & Taylor Machinery Company, Park being assignor. It issued November 10, 1903, and is numbered 744,015, and is for "a new and useful hand-hole cover." The inventor, in his specifications, says:

"My invention relates to the hand-hole covers employed in connection with the headers of water-tube boilers; and the object of the invention is to provide a hand-hole cover or cap which will conform to the sinuous curves of the headers ordinarily used, give access to a group of tubes without necessitating the use of a special form of header, and can be inserted or removed through the hand-hole it is to cover."

Both patents were held invalid by Judge Tayler as not involving patentable inventions in view of the state of the art, and both bills were dismissed.

2. Before determining the validity of the patents, there is a question of estoppel, which, if found for the appellants, is determinative of the case, without regard to the defense of invalidity. These patents were for subordinate parts or attachments to water-tube boilers. Prior to both inventions, Park had secured a patent for a new type of water-tube boiler, and later secured a reissue, being reissue No. 11,870. When he made the water-tube boiler invention he was an employé of the Aultman & Taylor Machinery Company. Having completed his invention, he entered into a contract with that company, by which they were to have the exclusive right to make and sell such boilers in consideration of a salary and a royalty upon the sale of boilers so made and sold by that company. Under this arrangement the Aultman & Taylor Company undertook to at once construct and test a trial boiler under the patent, the construction to be at their expense, and under Park's supervision. After many delays, a boiler was constructed according to Park's reissue patent and subjected to satisfactory tests. During the construction of this trial boiler Park devised and applied to that boiler the baffle brick and hand-hole cover of the two patents now in suit. The Aultman & Taylor Company were of opinion that if these parts were patented it would tend to the better protection of the boiler itself when put upon the market. Park says that he did not regard the parts as properly patentable, but at the instance of the Aultman & Taylor Company agreed to apply for patents and to assign his inventions to that company, they paying all expenses of same. The patents in suit were accordingly applied for by Park, and, when granted, issued to the Aultman & Taylor Company, as his assignee. Two years elapsed after the completion and testing of the trial boiler, but no sale was made of the patented boiler. At

that stage, the Aultman & Taylor Company sold out their entire general boiler business to the Stirling Boiler Company, the predecessor of the Babcock & Wilcox Company, appellants herein. This sale included all of the patents owned by the Aultman & Taylor Company which related to boilers or attachments, or parts of boilers, though no mention was made of the two patents in suit. And it is doubtful whether at the time either party knew of or cared about these patents. The royalty contract with Park, under which the Aultman & Taylor Company were to make and sell his water-tube boilers, was expressly excepted out of this sale; neither did the test boiler which had been made by that company pass to the Stirling Company, the predecessor of the Babcock & Wilcox Company, circumstances indicating that both Park and the Aultman & Taylor Company at that time regarded the baffle trick and hand-hole covers as appliances or appurtenances pertaining to that contract and to boilers made thereunder. As this sale divorced the Aultman & Taylor Company from the boiler business, it operated by common consent as a termination of Park's royalty contract, as well as of all relations to that company as a salaried employé.

In view of the circumstances under which the patents in suit were taken out, and of the fact that the new devices therein covered were principally valuable as parts of the Park water-tube boiler, the contention has been advanced that Park is the equitable owner of the patents in suit, notwithstanding they issued by his directions to the Aultman & Taylor Company, as his assignees. This contention we shall pass by, and for the purposes of this case assume that these patents passed to the Stirling Company under the sale by the Aultman & Taylor Company of all their patents relating to boilers.

This sale left Park free to make other arrangements for the manufacture and sale of his water-tube boilers under his reissue patent, No. 11,870. He accordingly left the employment of that company, and after some negotiations assigned that patent to the appellee company, and entered their employment under a contract by which he was to receive a salary and a commission or percentage upon the sale of all his water-tube boilers made and sold by them. Thereupon defendants began to make and sell the Park water-tube boilers, and in connection therewith employed the baffle wall brick and hand-hole cover of the later inventions of the same inventor. The evidence convinces us that both Park and his new employer, the Toledo Boiler Works Company, were not intentionally guilty of infringing the patents in suit. We are persuaded that Park had forgotten that patents had ever issued, and that the appellee company had no actual knowledge of that fact until they were given notice by the attorneys for the appellant that they were infringing after they had commenced to make and sell water-tube boilers with their appurtenances. Constructive knowledge only may be charged to appellee from the records of the Patent Office. We allude to actual innocence, not because ignorance is an excuse for infringement, but for its bearing upon the question of estoppel by reason of their connection with the inventor, Park.

Assuming, as we shall, for the purpose of this case, that Park him-

self would be estopped, by his sale of the patents in suit to the predecessor of the appellants, from relying upon their invalidity when sued for infringement, we come back to the question of whether there is any such relation or privity between the defendant company and Park as to affect them with his estoppel. But it is to be observed at the outset that Park is not sued. Neither is he a stockholder nor an officer of the Toledo Boiler Works Company. Neither did that company make any sale of either of the patents in question to the complainant or its predecessor in title. The only relation of Park is that he sold his water-tube boiler patent, to which the complainant has no shadow of claim, to the Toledo Company, and entered into their employment under a contract by which he is to receive a salary and a percentage upon all sales of his water-tube boiler made and sold by them. This gives him no financial interest in the profits or losses of that company. If they sell none of the boilers made under his patents, he gets nothing but his salary. Whether sales of the water-tube boilers are profitable or otherwise, his percentage is the same.

The Toledo Boiler Works is alone accountable to the Babcock & Wilcox Company for their infringement by using the parts covered by the patents in water-tube boilers made or sold by them under the Park water-tube boiler patent. Why shall they be estopped from defending their alleged infringement upon the ground of the invalidity of those patents? The ground upon which the assignor of a patent is estopped, when sued for infringement, to deny the validity of the patent he has sold, is that, having received a valuable consideration, he may not derogate from his grant by denying that it had any value. Thus in Babcock v. Clarkson, 63 Fed. 607, 11 C. C. A. 351, the Circuit Court of Appeals for the First Circuit, speaking by Judge Putnam, said:

"The precise nature of this estoppel does not seem to have been always clearly apprehended. It is, in effect, that when one has parted with a thing for a valuable consideration he shall not, so long as he retains the consideration, set up his own fraud, falsehood, error, or mistake to impair the value of what he has thus parted with. * * * This is as much in harmony with sound morals as with the fundamental rules of equity law; nor is it the usual estoppel in pais, arising from the representations or silence of the party against whom the estoppel is charged. Consequently, the estoppel which we apply to this case does not run against a patentee whose patent has been sold by his assignee in bankruptcy." Cropper v. Smith, 26 Ch. Div. 700; Smith v. Cropper, 10 App. Cas. 249, affirming the former case upon that point.

In Hall v. Conder, 2 C. B. (N. S.) 22, it was said by Lord Romilly, then Master of the Rolls:

"I do not intend to express my opinion as to the validity of Wright's patent. I will assume, for the purpose of my judgment, that it is worth nothing at all. But this is certain: that the defendant sold and assigned that patent to the plaintiffs as a valid one, and, having done so, he cannot derogate from his own grant. It does not lie in his mouth to say that the patent is not good."

The estoppel is one limited in character, and such an assignor, when subsequently sued for infringing the assigned patent, may show the state of the art for the purpose of limiting its scope.

This court, in Noonan v. Chester Park Club, 99 Fed. 90, 39 C. C. A. 426, said:

"It seems to be well settled that the assignor of a patent is estopped from saying his patent is void for want of novelty or utility, or because anticipated by prior inventions. But this estoppel, for manifest reasons, does not prevent him from denying infringement. To determine such an issue, it is admissible to show the state of art involved, that the court may see what the thing was which was assigned, and thus determine the primary or secondary character of the patent assigned, and the extent to which the doctrine of equivalents may be invoked against an infringer. The court will not assume against an assignor and in favor of his assignee anything more than that the invention presented a sufficient degree of utility and novelty to justify the issuance of the patent assigned, and will apply to the patent the same rule of construction with this limitation which would be applicable between the patentee and a stranger."

Such an estoppel extends only to the assignor patentee and those in privity of title or interest with him. It does not, therefore, extend to a patentee whose patent was sold by his assignee in bankruptcy. Cropper v. Smith, cited above.

A corporation is a legal entity. It may be estopped only by some corporate act or relation of privity of estate or interest under or with one who is estopped. Neither reason nor authority exist for holding that an infringing corporation is estopped from denying the validity of the patent sued upon merely because the assignor patentee is a subordinate in its employment. The cases of Boston Lasting Co. v. Woodward, 82 Fed. 97, 27 C. C. A. 69, and American Coat Pad Co. v. Phœnix Pad Co., 113 Fed. 629, 51 C. C. A. 339, are in point.

The counsel for appellants have cited as opposed to this view: Daniel v. Miller (C. C.) 81 Fed. 1000; Time Telegraph Co. v. Himmer et al. (C. C.) 19 Fed. 322. They are not in conflict.

Daniel v. Miller was an application for a preliminary injunction. Miller, the inventor and assignor, was a party defendant, and the only averment in the case, as reported, was that "the other defendants were acting in privity with him." In the course of the opinion, Judge Dallas said:

"There is more room for dispute as to whether the other defendants are also estopped, but I am clearly of opinion, upon the proof of privity and the coöperative infringement, that they are."

What the proof of privity was, does not appear.

Time Telegraph Co. v. Himmer was a bill against Himmer, who was the inventor and assignor to the complainant of the patent in question. The other defendant, Carey, supplied Himmer with the various parts necessary to make a number of complete infringing devices. Touching Carey, the court said:

"He occupies no better position than Himmer does. He is Himmer's alter ego in the scheme of pirating the complainant's rights. His general denial of interest with Himmer goes for nothing, in view of the facts and circumstances which are set forth in the complainant's affidavits, and which are sufficient to call upon him for a full and explicit disclosure of his relations with Himmer in order to exonerate himself."

The case seems to have been one in which Carey was a contributing infringer and liable on that ground, but what the facts were which

constituted him "the alter ego of Himmer" do not appear in the record of the case.

They have also cited Continental Wire Fence Co. v. Pendergast (C. C.) 126 Fed. 381. That is an opinion upon an application for interlocutory injunction by Judge Lochren. The opinion distinctly concedes that such an estoppel will not apply to mere employers of such an assignor, though Judge Lochren did find upon the facts of that case such evidence of "secret interest" as to justify the order asked, the assignor being a defendant along with others associated with him in the infringement.

Same counsel have also cited Woodward v. Boston Lasting Machine Co., 60 Fed. 283, 8 C. C. A. 622, and same case, 63 Fed. 609, 11 C. C. A. 353. Neither case supports the contention. They are commented upon and explained in the later case heretofore cited from 82 Fed. 97 (27 C. C. A. 69), where Judge Putnam, speaking for the Court of Appeals, said:

"We are again pressed with the proposition that the respondents below are estopped from denying the validity of the claims of the patent now in issue. The situation in this respect is, however, essentially different from that existing when the patent was previously under consideration. Then the respondents were nominally the same as now, namely, Woodward, who was the patentee and assignor of the patent, and James Barrett and Thomas Barrett; and in both cases all these respondents were and are, in a general sense, coöperating. The essential difference, however, is that in the prior suit Woodward, who was the only person directly subject to the rule of estoppel, was the principal, and the other respondents, so far as the evidence showed, were acting at his suggestion and in subordination to him. Now, so far as the evidence shows, the other respondents are the principals, and Woodward is their employé, and no estoppel applies to them by reason of their engaging Woodward in a subordinate position."

In Noonan v. Chester Park Club, cited heretofore, we assumed, without deciding, that where such an assignor afterward organized a corporation and became a shareholder and its president, which engaged in infringing the assigned patent, the corporation was affected by the estoppel. The later case of Lamb Knit Goods Co. v. Lamb Glove & Mitten Co., 120 Fed. 267, 56 C. C. A. 547, does not distinctly present any question of estoppel relevant here.

Under all the facts of this case, we are unwilling to hold the appellee company affected by any estoppel which affects Kennedy Park.

The defense of invalidity being open to the appellee, we quite agree with the conclusion of Judge Tayler that both patents are invalid as not involving patentable invention over the old art. The patent for baffle brick, No. 747,329, covers a metal casting cast around a previously formed fire brick, and the claims cover certain details. The state of the art pertaining to fire brick structures, subjected to great heat, was such as to enable any one familiar with that art to make such changes of the unimportant character shown in this patent, and supports the conclusion of the court below that the device does not exhibit patentable invention. It is enough to refer to the patent to Bradford, No. 62,927, and to Watson, No. 71,433, and to Bradbury, No. 218,616, and to Wellhouse, No. 350,331, and to Johnson No. 82,721. The other patent in suit, being the patent involved in case

No. 1903, is No. 744,015, for a hand-hole cover for closing the hand-holes in the headers of water-tube boilers. These hand-holes are the means of access through the headers to the expanded tube ends, for the purpose of removing or repairing them. The invention relates only to the covers for such hand-holes. "The object of the invention," says the patentee in his specifications, "is to provide a hand-hole cover or cap which will conform to the sinuous curves of the headers ordinarily used, give access to a group of tubes without necessitating the use of a special form of header, and can be inserted as desired through the hand-hole it is to cover." Mr. Albert W. Smith, the expert called by complainant, distinctly states the invention of the patent "to be an inner hand-hole cover to fit the ordinary sinuous headers of a water-tube boiler of such shape that the hole which it covers will give a maximum sized opening for access to the header interior, at the same time permitting the cap to be inserted and removed through the hole it is designed to cover." He concedes that the patent claims no novelty for the inside cap feature. The file wrapper and contents show that claims were made and rejected covering the form of hand-hole so shaped as to permit the cover to be inserted or withdrawn through the opening, and a cover with a groove into which a gasket fits to form a steam-tight joint, as well as a hand-hole cover or cap having inwardly curved sides arranged to conform to an ordinary sinuous header. Of these three features only the third, the shape of the sides of the cap and opening, is covered by the claims allowed. Referring to this feature, the specifications say:

"The advantages of my invention result from the peculiarly inwardly curved sides of the cap, which allow the ordinary sinuous header to be used."

The first claim reads:

"(1) A hand-hole cap having inwardly curved sides arranged to conform to an ordinary sinuous header, substantially as described."

The second claim reads:

"(2) A sinuous header or manifold having a hole to give access to a group of tubes, and an inside cap for the hole having inwardly curved sides to conform to the header, substantially as described."

The only noticeable difference between the claims seems to be that claim 2 requires that a single hole shall give access to a group of tubes, and that an inside cap shall be used, while claim 1 makes no such requirement. The claims of the patent must be sustained, if at all, in view of the proceedings in the Patent Office and the verbiage of the claims themselves, upon the inwardly curving sides of the hand-hole and cover so as to conform to an ordinary sinuous header. Hand-hole openings giving access to one or two or more tubes for the purpose of removing, cleaning, or repairing were old. It was old to cover such openings either with inside or outside caps, and, when by an inside cap, the hole and cap were made of such shape as to enable the cap to be inserted through the opening it was intended to cover. Neither was it new to give the hole and cover a shape to correspond with the shape of the header in which it was to be used. Reference may be made to the patents to Higgins, No. 358,394; Zell, No. 321,330;

Kelly, No. 350,201; and Hartley, No. 350,361. These patents, as well as others, are reviewed and explained by the experts for the defendants below in a most convincing way. It would not serve any valuable purpose to here insert the details of the patents to which we have referred. To give a hand-hole and cover such shape as to conform to the shape of a sinuous header and give access to a group of tubes would not seem to require anything more than the ordinary skill of one acquainted with the art and its history as seen in the patents referred to, as well as in others shown in the record.

The decrees must be affirmed.